JULIA McKENNA

*v.*

JAMES McKENNA.

*Opinion filed June 17, 1899—Rehearing denied October 4, 1899.*

1. MARRIAGE—*consent of both parties is essential to common law marriage.* It is essential to the validity of a common law marriage that both parties consent to the marriage agreement and to assumption of the relation of husband and wife.

2. SAME—*what is not assent by woman to marriage agreement.* Consent by a woman to sexual intercourse upon the man's statement that they were man and wife "before God and man," does not amount to assent upon her part to a contract of marriage.

3. The court reviews the evidence in this case at length, and holds it to be insufficient to establish a valid contract of marriage or to show that the parties assumed the marriage status after the alleged agreement was made.

*McKenna* v. *McKenna*, 73 Ill. App. 64, affirmed.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

WILLIAM A. DOYLE, and JAS. D. ANDREWS, for plaintiff in error.

FINLEY SCRUGGS, for defendant in error.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This was a bill filed to the July term, 1896, of the circuit court of Cook county, for separate maintenance, by one Julia McKenna, the plaintiff in error, against James McKenna, the defendant in error, basing her claim on an alleged common law marriage contract made in 1862. The defendant in error filed his answer, denying the allegations in the bill that he was married to the plaintiff in error, and denying that he lived and cohabited with her since the year 1862, or at any time previous thereto, as his wife. He alleges that after the great Chicago fire, in October, 1871, he rented a cottage and placed the complainant in it as housekeeper, where they lived for two or three years, and then moved into a flat, where they lived in the same manner until about 1881, but avers they did not cohabit as husband and wife. The answer was amended and a replication was filed thereto. A motion was made for temporary alimony and for solicitors' fees, and an order was entered referring the motion to the master in chancery to take proof on the question of complainant's solicitors' fees. Exceptions were taken to the master's report, and a re-reference was made to the master, to which report of the said master exceptions were filed, which were overruled. A trial was had before the circuit court, which entered a decree granting the relief prayed for in the bill. From this decree an appeal was taken to the Appellate Court for the First District, which reversed the decree of the circuit court. Plaintiff in error has sued out this writ of error from this court, and asks for the reversal of the judgment of the Appellate Court.

The principal question to be determined in this case is, was there a valid contract of marriage made between these parties, according to the common law? We held in *Port* v. *Port*, 70 Ill. 484, that a marriage without observing the statutory regulation, if made according to the common law, will still be a valid marriage. We there said (p. 486): "We are inclined to the opinion, supported,

as it is, by the statements of many of the most eminent text writers as well as by the decisions of courts of the highest respectability, that inasmuch as our statute does not prohibit or declare void a marriage not solemnized in accordance with its provisions, a marriage without observing the statutory regulations, if made according to the common law, will still be a valid marriage, and that, by the common law, if the contract be made *per verba de presenti* it is sufficient evidence of a marriage, or if it be made *per verba de futuro cum copula*, the *copula* is presumed to have been allowed on the faith of the marriage promise, and that so the parties, at the time of the *copula*, accepted of each other as man and wife. (Bishop on Marriage and Divorce, secs. 253, 254.) This is, however, merely a rule of evidence, and it is always competent, in such cases, to show by proof that the fact was otherwise. (1 Bishop on Marriage and Divorce, sec. 259; *Myatt* v. *Myatt*, 44 Ill. 473; *Conant* v. *Griffin*, 48 id. 410.) The rule is well illustrated by the language of Lord Campbell in *The King* v. *Millis*, 10 Clark & Fin. 534, (782,) quoted by Bishop in the paragraph last referred to: 'If the woman, in surrendering her person, is conscious that she is committing an act of fornication instead of consummating her marriage, the *copula* cannot be connected with any previous promise that has been made and marriage is not thereby constituted.'"

By the law of England marriage is considered in the light of a contract, and therefore the ordinary principles which attach to contracts in general are, with some exceptions, applied to it. (Broom's Legal Maxims, *486; 2 Stephen's Com.—5th ed.—254; 1 Blackstone's Com. 433.) It differs from other contracts only in this: that it cannot be rescinded at the will of the parties.

Marriage was held to be a civil contract by this court in *Cartwright* v. *McGown*, 121 Ill. 388, as follows (p. 398): "A marriage is a civil contract, made in due form, by which a man and woman agree to take each other for

husband and wife during their joint lives, unless it is annulled by law, and to discharge towards each other the duties imposed by law upon such relation. Each must be capable of assenting, and must, in fact, consent, to form this new relation. * * * When the consent to marry is manifested by words *de presenti*, a present assumption of the marriage status is necessary." And, quoting from *Van-Tuyl* v. *VanTuyl*, 57 Barb. 237, it was said: "On the other hand, it is not sufficient to agree to present cohabitation and a future regular marriage,"—citing *Robertson* v. *State*, 42 Me. 509; *Duncan* v. *Duncan*, 10 Ohio St. 182; *Beverson* v. *Beverson*, 47 Cal. 621; *Fryer* v. *Fryer*, Rich. Eq. 85; *VanTuyl* v. *VanTuyl*, 57 Barb. 235; 1 Bishop on Marriage and Divorce, sec. 262. Again, on page 401 it was said: "In the absence of consent, the status of marriage is never created by any government. The law compels no one to assume the matrimonial status. Without assent no statute or constitution can create this relation,"—citing *Dickerson* v. *Brown*, 49 Miss. 373.

It appears from the evidence that plaintiff in error and defendant in error first became acquainted in 1858 at the Richmond House, in Chicago, she being employed as a seamstress and he as bar-tender. At this time the acquaintance was merely casual, and not intimate. When the Sherman House opened, in 1861, both removed there, she as nurse for two little girls of the proprietor and he attending the bar of the house. Defendant in error says they both ate at the same table in the employees' dining room and became more intimately acquainted. In the dining room, he says, she would ask him for a little whisky as medicine, she being troubled with indigestion; that there was a back stairway leading down in a hall that led to the saloon, and he would meet her at the stairway and give it to her; that the meeting at the stairway continued for several months. Plaintiff in error denies he gave her whisky, and says a gentleman called on her once and took her out, and defendant in error called in

the evening and wanted to know who the gentleman was she was out with; that she told him he was a friend, and he said, "Either him or I will be coming here." She says she told him the object he was coming for was not his (McKenna's) object, and he said, "You don't know;" that he said he had a sister to educate, and that if he was not in a hurry he did not see why she should be; that after this she only went with the defendant in error. This is, briefly, a statement of their relations prior to the alleged contract of marriage.

Plaintiff in error's version of the facts which she claims constituted a contract of marriage is as follows: That one night in the early summer of 1862 McKenna came up to her room, occupied by the two children and herself, and insisted on staying there, and "I told him he could not stay there, but he said he would not leave the room that night. I said he must leave the room. He said he would not. I told him he would have to wait until we was married, and he lifted up his hands and he said that we were man and wife now, 'So help me God, we were man and wife.'" She says he stayed there all night and they occupied the same bed; that she never had sexual intercourse before this time. The court, during the course of the trial, asked the plaintiff in error this question: "Mrs. McKenna, in 1862 or 1863, when you say Mr. McKenna came to your room one night when you speak of being married or being husband and wife, state just what he said at that time." Her answer was: "He said he would not leave the room, and I said he could not stay there. He said he would. I said he could not stay there, and he said, 'Well, we are as much man and wife now; I take you as man and wife, so before God and man,' and he lifted his hands. Well, I said if he was to stay in that manner, certainly I would let him stay." This was all her testimony on the question of there being a marriage contract.

Defendant in error denies there was anything said there at that time in relation to marriage. His testimony

as to what occurred is as follows: "The meeting at the stairway continued for several months. They closed up that stairway then. It ceased to be a passageway, and she asked me again for the whisky, and asked me to bring it to her room. There was no other place that I could meet her or see her to bring it to her, and I came up at ten o'clock, and by that time the children would be asleep. She told me to speak low. The children were asleep. There was no gas lit—no light in the room. She had on a sort of a wrap, and we got fooling and I took hold of her, and she thanked me for the whisky and kissed me, and as we went by the door the bed sat on the side, and I leaned her over on the bed and laid on the bed for a few minutes, and we got up and took off our clothes and went to bed.

Q. "What did she say?

A. "She said nothing.

Q. "Did she say anything about taking off her clothes?

A. "She said, 'Let me get up and take off the rest of my clothes.' That was about all.

Q. "Was there anything said there about that time in relation to any marriage?

A. "Lord bless you! not a word. The two children were asleep in the bed. There was their bed there (indicating) and hers was at the other end of the hall (indicating). Staid there an hour and a half or two hours, and got up and left and went to my room. We whispered; didn't talk at all; afraid to talk; afraid of disturbing the children. It was in warm weather. I could not tell whether it was in June, July or August. That was the first time in my life I was ever in bed with her. Next saw her at meals, the next day,—at breakfast time, dinner and supper." He says he never went into that room again; that he was about eighteen or nineteen years old at that time.

Testing this by the rule laid down by this court in *Laurence* v. *Laurence*, 164 Ill. 367, "that it is necessary to

a valid marriage that both parties should consent to the marriage agreement and assume the marriage status," the evidence fails to establish a vital requisite of a common law marriage, to-wit, consent on the part of plaintiff in error. Plaintiff in error and defendant in error are the only witnesses on the question of the alleged contract. He denies there was anything said about marriage when the act of sexual intercourse took place in her room. The evidence of the one counter-balances the other. But taking her own version of what was said by defendant in error and what she replied, there was no such mutual present consent to take each other as husband and wife as is essential to constitute a common law marriage. The contract must be binding upon both or it can bind neither and is void for want of mutuality. When plaintiff in error detailed the conversation which she says took place when he said he was going to stay all night and she said "Wait until we are married," she says "he lifted his hand and he said we were man and wife." Her solicitor then asked the question, "Well, what followed this incident?" and she answered: *"Well, he stayed all night. We occupied the same bed."* Here there was no assent on her part. Subsequently, in reply to a question by the court a day or two afterwards, during the progress of the trial, she was asked to state again what he said, and replied: "He said, 'Well, we are as much man and wife now; I take you as man and wife, so before God and man,' and he lifted his hands. Well, I said if he was to stay in that manner, certainly I would let him stay." The words here spoken are not equivalent to a promise on her part to become his wife. She merely "let him stay." The words are no stronger than those used in *Hantz* v. *Sealy*, 6 Binn. 405. In that case the plaintiff and defendant had long lived in adulterous intercourse although they considered themselves lawfully married. In fact, they had entered into a marriage contract, which was void because the defendant had a former wife living from whom he had been

separated by consent, but not legally. After a legal divorce was procured they were advised by their lawyer to celebrate a new marriage. The defendant said, "I take you (the plaintiff) for my wife," and the plaintiff, being told if she would say the same thing the marriage would be complete, answered, "To be sure; he is my husband good enough." The court held that these words of the woman did not constitute a present contract, but alluded to the past contract, which she always asserted to be a legal marriage. Nor do the facts as established by the evidence bring the case within the rule declared in *Elzas* v. *Elzas*, 171 Ill. 635. There a common law marriage was sustained, but the man accepted the woman as his wife and she then and there accepted him as her husband.

The next question for consideration is whether the parties assumed the marriage status. If there was an agreement *per verba de presenti*, a present assumption of the marriage status is essential. (*Cartwright* v. *McGown*, 121 Ill. 388.) Proof of cohabitation as husband and wife does not constitute marriage, but it may be evidence of marriage in some cases. "*Consensus non concubitus facit matrimonium*," (it is the consent of the parties—not their concubinage—which constitutes a valid marriage,) is the universally accepted maxim. Coke's Litt. 33*a; Port* v. *Port, supra.*

As to what took place immediately after the alleged contract in June, July or August, 1862, up to 1871,—the time of the Chicago fire,—both parties testify, in substance, as follows: Plaintiff in error says that subsequently to the conversation in her room in the Sherman House McKenna visited her nearly every day and every night *when he had a chance;* that they sometimes occupied the same room, but not every night; that in November she changed her employment, as her employers went to New York to open the St. Nicholas Hotel; that she remained in the city and was taken sick during the time of packing and fussing and had a miscarriage, and that

McKenna took her in a carriage to a friend of hers; that he was in the house while she was sick; that he had all her meals sent to her, and she had all the attendance that could be given but had no nurse; that she got up in a day or two and then had to vacate the room; that she then went to the Tremont House to sew for Mrs. Gage; that it was in November; that she then worked at sewing for Mrs. J. B. Drake for a year; that she left there and went to boarding with a lady friend; that McKenna would meet her and take her home almost every evening; that she became pregnant again while working for a Mrs. Mix, on Washington street; that McKenna got her a room on the north side; that she went there and gave birth to a seven and a half months old, still-born child; that McKenna was present; that she did not return to the Sherman House again, but went to Mrs. Drake's; that another child was born in May, before the fire in 1871; that it was born about three o'clock in the afternoon and lived until twelve o'clock that night; that she lived in a flat from November until the June before the fire; that plaintiff in error rented the flat and defendant in error furnished the money to pay the rent and expenses; that in May, 1871, she went to Wabash avenue and McKenna paid her board; that she took the name of McKenna for the first time while they were keeping house on West Madison street, before the fire; that was four or five years after that happened, (referring to the time the alleged contract was made in her room.) She was asked, "Up to that time you were known as a single woman, were you?" and answered, "Yes, sir. I went to board on Wabash avenue a little while before the fire, in 1871. From that time until the fire McKenna and I did not live together. We saw each other frequently."

Defendant in error testified, in substance, as follows, as to what took place during this same period of nine years: That he met her the next day at breakfast time, dinner and supper, (referring to the day after the even-

ing they met in her room in the Sherman House); that he next met her by arrangement on the corner and went to a hotel on the north-east corner of Madison and Market streets; that she left the hotel (Sherman House) within a year and went to live over a saloon on Clark street; that he lived at the Sherman House until it burned down, in 1871; that from the time she left the Sherman House she never came back again; that he does not know what year it was she was in a delicate condition,—in a family way,—but she had moved to some place on Monroe street; that she did not want the people to discover her condition; that he got a washer-woman of his on the north side to care for her, and she went over there; that he did not go with her; that she told him the friends where she had been living, out on Monroe street, had sent their little boy to follow the express wagon that took her trunk, to see where it went to, and she felt very bad about their discovering her condition and where she had gone; that she then went to St. Joseph's Home, on the west side; that she wrote to him and told him if he wanted to see her, to address her in his name; that she had taken his name on account of those friends discovering what took place; that he addressed the letters in his name in order to shield her; that it was some time in 1863 or 1864; that he could not tell the year; that some time after that she told him she was in an interesting way, and he got her a place on West Madison street; that he thinks she rented the apartments herself; that he went there and stayed at night with her until three or four months before she would likely be ill, and then got a midwife to come and care for her; that he stayed at the hotel, and never said anything about his relations with the woman.

This evidence fails to show that these parties assumed the marriage relation immediately after the meeting in her room in the Sherman House, or for four or five years following. She says he visited her nearly every day and every night *when he had a chance,* clearly show-

ing that the meetings were clandestine in character, and during this period of time she swears she was known as a single woman. The first time she took the name of McKenna was when they were keeping house on West Madison street, and he explains why she did this. Her name was Bridget Doyle but was called Julia Doyle, and she was known as such until four or five years after the alleged contract of marriage. It was said in *Becking's Appeal*, 2 Brewst. 202: "A man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; may, in order to gratify her, hold himself out to her acquaintances as her husband; may be a constant visitor, and often eat and sleep at her house; may recognize the fruit of the connection as his children and manifest affection for them; and yet the evidence may fall far short of that which ought to satisfy the mind that there was an actual agreement to form the relation of husband and wife." (See, also, *Physic's Estate*, 2 Brewst. 179.) During this period the evidence shows, beyond question, an unlawful intimacy instead of the lawful relation of husband and wife.

The evidence from 1871, after the Chicago fire, until 1894, when plaintiff in error left the house on Michigan avenue, is very voluminous, and can only be referred to briefly, within the limits of an opinion. Plaintiff in error testifies she kept house for herself and McKenna from 1871 to 1876, a portion of the time in a cottage and then in flats; that defendant in error came there every day or every other day; that McKenna took his meals at the hotel, but had a room in the house and would come there and sleep with her; that they did not live together from the spring of 1876 until September, but he came every day to see her; that in September they went back to Van-Buren street, in the same block they had lived before, and stayed there until February the next year; that McKenna was still at the hotel but stayed there a part of the time; that then she went to a Mr. Hughes and stayed

three or four weeks, and then went to a Mrs. McDonald and stayed there until June; that defendant in error refused to give her any money and she went to St. Joseph's Home, where she stayed a year and a half; that McKenna wanted her to take up housekeeping again, and she went to the VanBuren block and got two rooms from a lady friend and stayed there until there was a flat vacant, when she took that again and stayed there one year; that McKenna came there most every day, he being then at the Grand Pacific Hotel.

Defendant in error testified, in substance, that after the fire he had no place to live, and it was impossible to get a furnished room anywhere, and he slept in a black-smith shop three nights; that he heard of a cottage that was for sale with a lease; that he bought the furniture, paying $400, and got the lease; that he then found this woman and asked her to come there and take care of the place; that he had nowhere to sleep and she could stay there as housekeeper; that he stayed there about a year, until the house was moved off the lot; that then they moved further east on VanBuren street and took a flat; that he would go to the house at twelve or half-past one o'clock at night and stay until half-past eight or a quarter of nine in the morning, and then go to his business at the Grand Pacific Hotel and get his breakfast and go to work; that it must have been about 1874; that there was a time when he did not see her or hear of her for two and a half or three years, when he met her on Adams street and shook hands with her and was glad to see her; that he asked her how she was getting along and what she was doing; that she told him she had just come from trying to get a place with Mrs. Drake; that he asked her what Mrs. Drake said to her, and she said she questioned her about what she had been doing and where she had been living, and she told her she had been married to one Jim Jones, a hackman here; that she then asked him for money and he gave her $60, $80 or $100,—every cent he

had; that this was before he went to the centennial; that
in 1876 the plaintiff in error had rooms on the west side,
and he would probably go once a week, or two or three
times when he had nothing to do, in bad weather; that his
room in the hotel was cold and there she had a good fire;
that during this time he says he spent his nights in his
room in the hotel; that after 1881 she went to a Mrs. Cul-
lings, and was there two and a half or three years; that
the first year he believes he was not in the house; that
he never went there until he put the child there, (refer-
ring to a child he had adopted himself and which he took
there for plaintiff in error to care for;) that in 1890 de-
fendant in error was living in a house he had built on
Michigan avenue, with his sister, a nurse for this adopted
child, and a kitchen girl; that he took her to the house
and introduced her to Rose Meeghan, saying, "This lady
will take charge of the house; my sister is going away
and I would like to have you all try and satisfy her; she
is the same name as I am, but no relation;" that in regard
to putting plaintiff in error out of this house, he said
to Rose she would have to go, and he wanted her to go
peacefully, if she would, and if she wouldn't he would
have to put her out.

Plaintiff in error says he brought the adopted child
to her at Mrs. Cullings' in 1889, and said, "Here, mamma,
take the little girl;" that McKenna came to the sisters,
where she was boarding, and took her to this house on
Michigan avenue, and took her up-stairs and said, "This
is your room and this is your bed, and you must never
leave it;" that this was in May, 1891; that about a year
afterwards she was taken sick and he advertised for a
housekeeper; that a Mrs. Gale came; that when she left
a second housekeeper came,—a Miss Fisher, who was
about twenty-five years old,—and then there was a great
deal of disagreement.

Witnesses were introduced to show that between 1871
and 1890 defendant in error introduced plaintiff in error

as his wife in two or three instances, but this he denies. It appears that from 1871 to 1890 he paid rent for her, and she says they rented a box in a safety deposit vault together and she cared for money for him, and she says they stood up as god-father and god-mother for a child. Defendant in error, it appears, as a single man, dealt in real estate, deeding and mortgaging property. Defendant in error also introduced witnesses who had known him intimately for years and had known him only as a single man,—a bachelor. During the time plaintiff in error lived at his home on Michigan avenue her position in the household was uncertain. She claims they occupied the same room, which he denies. She claims she was called "Mamma" by the adopted child, and that he gave her a room and bed and told her she must never leave it, and claims that she was his wife, while he says he took her there as housekeeper.

We have referred in the foregoing to the principal facts and circumstances in evidence in this case, and the question is, do they show that plaintiff in error and defendant in error cohabited as husband and wife, and held themselves out to the world as such, and were received by their friends and neighbors as such. The relations existing between them were never disclosed by defendant in error to his most intimate friends, as they regarded him as a bachelor. His business associates, who dealt with him in real estate transactions, where he executed deeds and mortgages, regarded him as a bachelor, and he executed them as a single person. He always boarded at the hotels where he was employed, though he occupied the same bed with plaintiff in error for many years. There is evidence showing that he introduced plaintiff in error to persons as his wife and as Mrs. McKenna. This is denied by him. It also appears that he paid her rent and expenses the greater part of the time from 1871 to 1890. He addressed letters to her as Mrs. James McKenna, but he says it was at her request, when she was pregnant, to

protect her reputation among her friends.   Much of the evidence, however, is conflicting in many particulars. The cohabitation was not continuous and uniform.   Sometimes they were living together, though he always took his meals at the hotel where he was employed.   Then again she was boarding by herself for a year or more and he lived at a hotel, both living as single persons.

After carefully considering the evidence in the record we are impressed with the idea that instead of these parties cohabiting as husband and wife and holding themselves out to the world as such, there was a constant effort to conceal what they must have believed was an illicit cohabitation.   The reputation, at least, is divided, and is not sufficient proof of marriage.   What was said by Lord Elden in *Cunningham* v. *Cunningham*, 2 Dow, P. C. 482, seems to apply here: "When the connection was at first notoriously illicit and a change in the character of the connection must be operated, and the means employed for that purpose are such as to leave half the world in doubt, the relations one-half thinking one way the other half the other, at what time—in what circle—could it be said that there was such a habit and repute as raised the presumption that the parties had mutually consented to be husband and wife?   He could not admit that mere cohabitation as man and woman was a cohabitation as husband and wife."

As to the validity of the proceedings culminating in a decree in 1894, wherein the plaintiff in error disclaimed being the wife of the defendant in error and her bill was dismissed for want of equity, as this case is disposed of on its merits it will not be necessary to consider the questions growing out of those proceedings.

The evidence failing to show a valid contract at common law, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*