## George M. Marks v. Margaret Marks.

1.   Husband and Wife—*What Does Not Amount to a Present Con-tract of Marriage.*—The following conversation was relied upon as constituting a present contract of marriage : " Mr. Marks said that I could come to him and be his wife." "I told him I would go with him." *Held,* not to constitute such contract.

2.   Same—*Conduct Amounting to Marriage Under a Contract De Futuro.*—Where parties competent to contract have agreed to marry at some future time, and have *copula,* which is lawful only in the married state, in the absence of any evidence to the contrary they will be presumed to have become actually married by taking each other for husband and wife, and to have changed their future promise to marry, to one of present marriage.   In such a case the *copula* will be presumed to have been allowed on the faith of the marriage promise, and that the parties, at the time of the *copula,* accepted each other as man and wife.

3.   Same—*Marriage Not to Be Presumed from the Continuance of a Relation Illicit in Its Commencement.*—When the relation between a man and a woman, living together, is illicit in its commencement, it is presumed to so continue until a changed relation is proved.   Without proof of subsequent actual marriage, it will not be presumed from con-tinued cohabitation and reputation of a relation between them which was of illicit origin.

4.   Same—*Proof of Cohabitation Does Not Constitute Marriage.*—Proof of cohabitation as husband and wife does not constitute mar-riage, but it may be evidence of marriage in some cases.

Bill for Separate Maintenance.—Appeal from the Superior Court of Cook County; the Hon. Axel Chytraus, Judge presiding.   Heard in this court at the October term, 1902.   Reversed.   Opinion filed June 18, 1903.

Stedman & Soelke, attorneys for appellant.

The meretritious relationship of the appellant and the appellee when shown to have been commenced, was pre-sumed to continue.   McKenna v. McKenna, 180 Ill. 577; Cartwright v. McGown, 121 Ill. 388; Crymble v. Crymble, 50 Ill. App. 544.

There must be an actual agreement, and the living together must commence as the result of said agreement in order to constitute a common law marriage in this state. Laurence v. Laurence, 164 Ill. 367; Maher v. Maher, 183

Ill. 61; Port v. Port, 70 Ill. 484; Cartwright v. McGown, *supra.*

A common law marriage is not valid unless both parties accede in good faith and each intended thereby to become husband and wife. Baird v. People, 66 Ill. App. 671.

G. A. ELLINGSON, attorney for appellee; CLARK VARNUM, of counsel.

MR. JUSTICE ADAMS delivered the opinion of the court.

Margaret Marks, appellee, claiming to be the wife of George M. Marks, appellant, and that he had abandoned her without her fault, filed a bill against him for separate maintenance. The court found in her favor and decreed that he pay her $9 per week. The contested question in the case is, whether the parties were married. Appellee claims a common law marriage. It appears by appellee's testimony that October 22, 1895, she, while an inmate of a house of ill-fame, at 74 South Peoria street in the city of Chicago, first became acquainted with appellant, who then had just made his advent into the outside world from the state penitentiary, to which he had been committed for forgery. The appellee had previously been convicted of larceny. Appellee testified that the night of October 22, 1895, she and appellant occupied the same bed; that they associated together then and have ever since. Appellee's testimony in regard to the conversation between herself and appellant on which, with other circumstances, she relies as evidence of a common law marriage, is, in substance, that about noon December 24, 1895, " Mr. Marks said I should come to him and be his wife." Q. " What did you say to him when he made this proposition to you to go with him and be his wife?" Here there was an objection and the court said, " She may answer; what did you say?" A. " I told him I would go with him, Your Honor." Q. "And be his wife?" A. "And be his wife, yes, sir." The last question was objected to and the court said: " I understood your objection perfectly well. I think it well taken, because it assumes that the witness

had previously said something, and puts the answer in the mouth of the witness.   What the lawyer assumed, in asking the question, was not binding on the court, and did not influence the court in the slightest degree.   The question was, what did she say."   Appellee testified, in substance, that after the conversation she and appellant went shopping, after which, and about twelve o'clock midnight, they went to a rooming house at 192 West Monroe street, kept by Kate O'Donohue, which they reached about one o'clock December 25, 1895, when they engaged rooms.   Appellee says she did not know the lady, but had been referred to her as one having rooms to rent; that appellant said to Mrs. O'Donohue, "My wife and myself want to have these two rooms for our own rooms;" "and I said, in the way of introduction to the lady, ' This is my husband, Mr. G. M. Marks.'   Mr. Marks had been in the rooms before; and that same evening we went there and lived there till March, 1896, when we removed to 105 South Halsted street, where we remained till June, 1896, when we removed to the Monroe House in the rear of a grocery store, and in the next winter or spring moved to 18 South Halsted street, and afterward we lived successively at 48 South Halsted street, 43 South Sangamon street and 63 South Elizabeth street, at which last mentioned place we were living April 18, 1902, when appellant refused to live longer with me."   Appellee testifies to numerous introductions of her by appellant to others as his wife, and by her of appellant to others as her husband.   Appellee testified to receiving, July 18, 1901, a registered letter from appellant containing money, which letter and the address thereof are as follows :

" CHICAGO, July 17, 1901.

DEAR WIFE :   Yours of the 15th inst. at hand, and everything is all right here.   The weather is terrible hot—around 95 in the shade for the last four days.   Enclosed find the money you asked for.   This is all at present.

Yours as ever, GEORGE.

Give my remembrance to all the folks.   Bye, bye."

Address on envelope :   " Mrs. G. M. Marks, 949 S. 10th street, Denver, Colo., care of   Mrs. R. B. McClellan."

Appellant testified in regard to this letter that he did not want to compromise appellee in the company in which she then was, and he addressed the letter in the way he did because she had written to him, telling him to do so, and to register the letter, as that was the only way she would get it.

Appellee further testified that she received the following note from him: "Bee, come up at once. Must go away for a couple of hours. G. M. 92." On the back of which note is written: "Mrs. Marks, 105 So. Halsted street, near Monroe street." It also appears from the testimony of appellee and of other witnesses that appellant, January 8, 1900, became a member of the Improved Order of Heptasophs, a benefit association, and a benefit certificate was issued to him in which the beneficiary was stated to be "his wife, Maggie Marks." Appellee testified that appellant showed the certificate to her, and that the words, "wife, Maggie Marks," were in it. The certificate was not produced, but appellant did not deny the evidence above stated. He testified that he never had possession of the certificate; that he left it in the safe of Drielsma, who was the financial agent of the association. Drielsma testified that he delivered the certificate to appellant. It appears from the evidence that after the conversation, heretofore detailed, between the parties, December 24, 1895, and after, as appellee testifies, they took rooms at Mrs. O'Donohue's place, appellee followed the vocation of what is called a "street walker," soliciting men on the street. Robert Stafford testified that he knew appellee along in 1896; that he saw her soliciting gentlemen, and that she went by another name than Marks then, but he did not remember the name. Peter Smith testified that he became acquainted with appellee in the spring of 1896, and that "she was running around soliciting." Appellant testified that appellee's vocation, after the alleged agreement to marry, "was soliciting men on the street."

Appellee, called in rebuttal, testified:

"From the 24th of December, 1895, until the spring of

Marks v. Marks.

1896, Mr. Marks was doing nothing. He was doing the cooking, while I was around soliciting for him. It was by his directions. I was compelled to go on the public street. I quit soliciting the minute Mr. Marks started and established himself at 92 South Morgan street. That was in the spring, about the 1st of May, I think."

It appears from appellant's testimony that he knew of this conduct, or rather misconduct, of appellee. He testified:

"The time I slept in the harness shop, if you want to know, was the times she had other company in the house. I knew the other company was there. I did not receive any of the money."

Appellee testified that March, 1896, he gave her a ring, which she calls a wife's ring; that he gave it to her because her mother might remark, "Where is your wedding ring?" That the first ring was lost and he subsequently gave her another, remarking that he hoped she would have better luck with it. Appellant testified that he never gave her but one ring, which was given about three years before the hearing. A short time prior to April 19, 1902, a disagreement sprang up between the parties, and at the last date appellee executed the following instrument:

"This deed of separation, executed this 19th day of April, A. D. 1902, by and under the hand and seal of Graddy Neumas, of the city of Chicago, county of Cook and State of Illinois, witnesseth, that whereas, the said Graddy Neumas and George M. Marks had been living together for some time past, although no ceremony of marriage, either common law or statutory, or any agreement of marriage, has ever been contracted, performed, or entered into by them, and they having mutually agreed to live separate and apart from each other for the future, have decided upon and do each in their own proper name bind themselves to live up to and keep the following agreements, to wit:

Said George M. Marks, upon signing and delivery of this deed to him, covenants and agrees that he will pay to said Graddy Neumas the sum of two hundred dollars in cash, and give to her the full, clear and absolute title to the household furniture heretofore used by the parties hereto while living together.

Said Graddy Neumas in consideration of above payment

and agreement hereby absolutely and fully renounces all claims in law or equity, in and to all lands, tenements, goods, chattels, choses in action, or other property, that now or hereafter belong to said George M. Marks, and that said property above described and said sum of money above referred to, are hereby received by her in full and final settlement of any and all claims she now has or may in the future have, either in law or in equity, for support and maintenance, debts or obligations of any nature whatsoever against George M. Marks, and all claims which she now has or may in the future have in or to any real estate or other property which now or may hereafter belong to or be in any manner acquired by said George M. Marks, hereby releasing and waiving all right under and by virtue of any laws of this state, or the common law.

The said Graddy Neumas further agrees that she will live separate and apart from the said George M. Marks, that she will not interfere with, molest, or in any way annoy said George M. Marks or contract any obligation or debt in the name of said George M. Marks, and will keep him free and clear of any and all obligation of any nature whatsoever that she may contract or become responsible for.

MISS GRADDY NEUMAS. [SEAL.]"

Appellee acknowledged the instrument before H. W. Kuetmeyer, a notary public, April 19, 1902. The certificate of acknowledgment is in the usual form.

Appellee testified in regard to the instrument that appellant told her that she had better go down to the Reaper Block, to Benedict Short's office, with her mother, and sign a paper, if she valued her life, and that she was afraid of her life if she did not go, and that when she went to Short's office she told Short that appellant had threatened her, and that she was afraid of him; that Short told her to be seated; that he told her she was not a common law wife; that it lacked about two minutes of two o'clock when she got to the office, and she asked Short if appellant would be there at two o'clock, and he said "Yes," and when appellant came he gave $200 to Short and Short gave the money to her; that the instrument was read by Short, and she signed it.

Q. "Didn't Short say to you, 'Well, this is ready to

Marks v. Marks.

sign,' and you said, ' I will sign it when I get the money and not before?'"    A.    "I don't recollect."

She further testified :

" My maiden name was Margaret Neumas.    I don't know why I signed Graddy.    I didn't know what I was doing. I took the money and went about my business."

Benedict J. Short testified that he drew or dictated the document April 19, 1902; that appellee did not tell him she was in fear; that until the last date he had not known appellant; that appellee said that was all she wanted to know, because they had agreed to go to some strange lawyer, not acquainted with either of them; that he told her he had the paper ready and she said, " May I look it over before I sign it?" and that he read it to her; that she asked him if two people were living together, and the woman passed as wife, and he introduced her as wife, if that was a common law marriage, and he said " No," when she said, " Well, you better let me see that paper myself.    I want to read it over myself;" and that he handed her the paper and she read it over, and after she had read it appellant came in, and he and appellee talked in a general way for a few minutes, when she said she didn't know whether she would sign that paper or not, and I said, " It is a matter of your own doings.    If you want to sign it, why you know what it contains; if you don't, then that settles it."    She said, " Well, I will sign the paper, because if he don't want me, why I don't want him." or something to that effect. She then wanted to know where the money was, and appellant counted it out to me, and I counted it so she could see me, and said :    " There is the money; now you can sign this paper," so she signed it.    She told me I had part of the name spelled wrong, and wanted to know if I would have it rewritten, and I said I could alter it before she signed, and it would be just as good.    So I inserted the correct name, and she signed, and took the $200, and she and her mother stepped out.    Before this I had called Mr. Kuetmeyer in to take the acknowledgment of the paper.    Three or four weeks later she called and asked for a copy of the

paper, which I prepared for her.    At that time I said to her,
"Oh, you folks will make up;" and she said, "Well, I will
never make up until he does what is right by me, and mar-
ries me."    I then said, "Insist on a marriage ceremony, so
that you will have the legal right as his wife, if he wants to
live with you again," and she said she certainly would.

H. W. Kuetmeyer, the notary, testified that he asked
appellee if the signature to the instrument was hers, whether
she had read it, whether it was her free act and deed, and
whether she knew its contents, and she said, "I certainly
do."    Also that neither appellee nor her mother stated
that they were in bodily fear, or any fear at all.

Appellant testified that appellee's mother advised a set-
tlement, and that he and appellee finally agreed on the
settlement which was made, and also agreed to go to a
strange lawyer unacquainted with either of them, and that
he did not threaten appellee at any time.    Appellee weighs
from 165 to 170 pounds and is about five feet eight inches
in height.    The evidence shows that she is not in the least
afflicted with timidity.

A paper was put in evidence by appellant, which is as
follows :

"This certifies that George Marks and Maggie Neumas
were united by me in the holy bonds of matrimony, at
Trinity Church, on the 18th day of January, 1896.
                    Signed :   REV. T. M. MORRIS.
In presence of
            G. WEBER,
            M. WOODS."

In regard to the paper, appellee testified that it was in
her handwriting; that she got the blank from a Mrs. Lewis,
and appellant told her to fill it out with the names in it and
hang it on the wall, and that she did so January 18, 1896,
and that it hung up for about three years.

Appellant testified that appellee told him that she had
gotten a blank from Mrs. Lewis; that he did not tell her
to fill it out, or put names in it, but told her he did not
want it hanging in the house; that any one could see it
was in her own handwriting, and that, according to the

date on it, he did not see it for more than two years after it was filled out.

It is apparent from the record that appellee is uncertain when, if at all, the conversation of December 24, 1895, between her and appellant, to which she testified, occurred. She avers in her bill, which is sworn to by her, " that, on the 22d day of October, 1895, in the city of Chicago, county of Cook and State of Illinois, your oratrix was married to the said George M. Marks according to the common law." She testified on the hearing that the conversation occurred December 24, 1895, while she was still an inmate of the house of ill fame, 74 South Peoria street. In regard to this variance, appellee's counsel say, " the date was amended before trial to read December 24, 1895." There is no evidence of such amendment in the record; but assuming that it was made, it may be accounted for on the hypothesis that appellee had legal advice to the effect that the conversation in question, having occurred at a house of ill fame and having been followed by continuous association between the parties at said house, as formerly, until December 24, 1895, it would be worthless as evidence of marriage. When, for the purpose of deceiving third persons, she filled up a blank form of certificate of marriage, purporting to have been celebrated by a clergyman, she fixed January 18, 1896, as the date of the marriage. The conversation relied on is : " Mr. Marks said that I could come to him and be his wife." " I told him I would go with him Your Honor."

Appellee's counsel assumes that this alleged conversation is a present contract of marriage, a contract per *verba de presenti*. In this we differ with counsel. At the very utmost it can only be claimed that it is a contract *de futuro*, and it is a matter of grave doubt whether it is the latter. In Cartwright v. McGown, 121 Ill. 388, 399, the court say:

" In Hantz v. Sealy, 6 Binn. 405, the plaintiff and defendant had long lived in adulterous intercourse, although they considered themselves as lawfully married. In fact, they had entered into a marriage contract which was void, because the defendant had a former wife living, from whom

he had been separated by consent, but not legally. After a legal divorce was procured, they were advised by their lawyer to celebrate a new marriage. The defendant said : ' I take you (the plaintiff) for my wife;' and the plaintiff, being told if she would say the same thing the marriage would be complete, answered, ' To be sure, he is my husband—good enough.' The court held that these words of the woman did not constitute a present contract, but alluded to the past contract, which she always asserted to be a legal marriage."

In the same case the court say of a contract *de futuro :*

" Where parties competent to contract have agreed to marry at some future time, if they have *copula*, which is lawful only in the married state, in the absence of any evidence to the contrary they will be presumed to have become actually married by taking each other for husband and wife, and to have changed their future promise to marry, to one of present marriage. In such a case the *copula* will be presumed to have been allowed on the faith of the marriage promise, and that the parties, at the time of such *copula*, accepted each other as man and wife. Port v. Port, 70 Ill. 484; Hebblethwaite v. Hepworth, 98 Id. 126. This kind of a marriage must be distinguished from cases of seduction, or sexual intercourse followed by a promise of marriage, and cases where the intercourse, in its inception, is illicit, and is known to be such. Cheney v. Arnold, 15 N. Y. 345; Duncan v. Duncan, 10 Ohio St. 181; 1 Bishop on Marriage and Divorce, Sec. 261." See also Ib. 403.

In McKenna v. McKenna, 180 Ill. 577, 583, the complainant testified that the defendant was soliciting her to permit him to remain all night with her, when she said, " Wait until we are married;" and " He lifted his hand and said we were man and wife. He said, ' Well, we are as much man and wife now. I take you as man and wife, so before God and man,' and he lifted his hands. Well, I said if he was to stay in that manner, certainly I would let him stay." The court held there was no present contract of marriage, citing Hantz v. Sealy, *supra.*

Appellant denied that the conversation testified to by appellee as having occurred December 24, 1895, ever occurred, or that he ever promised to marry her. In the McKenna case, cited *supra*, the complainant testified to the

conversation and the defendant denied it, in respect to which the court say:

" Plaintiff in error and defendant in error are the only witnesses on the question of the alleged contract. He denies there was anything said about marriage, when the act of sexual intercourse took place in her room. The evidence of the one counterbalances the other."

This language is strictly applicable to the testimony of the present parties as to the alleged conversation of December 24, 1895. The evidence tends to prove that after appellee left 74 South Peoria street the parties recognized each other as husband and wife, and cohabited apparently as such, and introduced each other to their friends, acquaintances and strangers as such, and that appellee went by the name " Mrs. Marks," and was so known to others, and that appellant wrote the letter and note and the addresses thereof heretofore mentioned, and appellee's counsel claims that these circumstances corroborate appellee's testimony.

In Cartwright v. McGown, 121 Ill. 406, the court say:

" When the relation between a man and a woman, living together, is illicit in its commencement, it is presumed to so continue until a changed relation is proved. Without proof of subsequent actual marriage, it will not be presumed from continued cohabitation and reputation of a relation between them, which was of illicit origin."

In the same case, p. 402, the court say:

" It may be said that the holding of Zerelday out to the world as his wife showed a desire to change his connection with her to that of marriage. But little importance can be attached to this circumstance, when considered in connection with the other facts of the case. A concubine is often held out to the world as a wife to conceal an illicit cohabitation and prevent a criminal prosecution." See also Crymble v. Crymble, 50 Ill. App. 544, to the same effect.

Cohabitation and repute are but evidence of marriage, and the presumption arising therefrom may be rebutted by the acts and declarations of the parties.

In McKenna v. McKenna, *supra*, p. 564, the court say:

" Proof of cohabitation as husband and wife does not constitute marriage, but it may be evidence of marriage in

some cases. *Consensus non cubitus facit matrimonium*—It is the consent of the parties, not their concubinage, which constitutes a valid marriage—is the universally accepted maxim."

In Cartwright v. McGown, 121 Ill. 400, the court say:

"But it must be borne in mind that cohabitation and repute do not constitute a marriage, but are only evidence tending to raise a presumption of marriage of more or less strength, according to the circumstances of the case, and that the cohabitation must not be meretricious but matrimonial, in order to give rise to this presumption."

Bishop says:

"When special facts render improbable any desire of the parties for marriage, the presumption that they are married will be less easy, whether the beginning of the cohabitation was illicit or not. Thus, it is so when the woman is shown to be a common prostitute." 1 Bishop on Marriage and Divorce, etc., Sections 967, 968.

In Maher v. Maher, 183 Ill. 61, 66, the court say:

"Cohabitation and repute do not alone constitute the marriage, as that can only depend on the mutual consent of the parties. The recognition of the marriage relation by the parties themselves and by friends and relatives, together with their declarations and conduct in holding themselves out as husband and wife, being the mere manifestations that the parties have consented to contract that relation between them, causes those facts to only raise a presumption of the actual contract having been made between the parties. A presumption of that character may be overcome by other presumptions which spring from the acts of the parties themselves during the time of cohabitation, as well as from acts and declarations and conduct springing from their acts after cohabitation between them has ceased."

The first house in which the parties lived, after appellee's removal from 74 South Peoria street, was 194 Monroe street, and was kept by a Mrs. Kate O'Donohue. Mrs. O'Donohue testified that in 1896 her place was "pulled" and the girls were taken along, and Mr. and Mrs. Marks with them. Appellant testified that two of the other places at which they lived after the alleged agreement were assigna-

tion houses.    There was no change for the better, but rather
for the worse in appellee's conduct and mode of life after
she left South Peoria street.    While at the latter place it
appears from the evidence that she received and enter-
tained visitors at the house, but after she left that place
she became a common street walker, soliciting men on the
public streets, taking them to her room, and there enter-
taining them.    This mode of life, according to her own
testimony, she continued until May 1, 1896, more than four
months after the alleged conversation of December 24,
1895.    Appellant knew that appellee was thus acting.    He
testified that he did not sleep constantly at the O'Donohue
house; that when he did not sleep there he slept at Lewis'
harness shop on a cot, and the reason he slept in the latter
place was because he knew appellee had other company at
the house.    This conduct we regard as utterly inconsistent
with the assumption by the parties, in good faith, of the
marriage relation.    Appellee, after her removal from
South Peoria street, told a number of persons that she
was not married to appellant.    Mary Thomas, appellee's
mother, testified that early in April, after trouble had
sprung up between appellee and appellant, appellee told
her that she was not married to appellant.    In April, 1902,
she said to Mrs. McPhillips :

"I am very glad, Mrs. McPhillips, that I am not George
Mark's wife.    I am only his common-law wife.    I never
was married to George Marks."

Appellee, in her testimony, said she didn't think she
knew what a common-law marriage is.    Robert Stafford
testified that about five weeks before the hearing he heard
appellee use the most opprobrious and indecent language
to appellant, which can not be here repeated, and say to
him, among other things, "You never was my husband,
anyway ;" also that in the summer of 1897 he, witness,
went to 18 South Halsted street, and there saw appellee,
and she said to him :

"Bob, get me an express wagon.    I ain't going to live
with George any longer.    I ain't married to him, and I

ain't going to live with him any longer. He was mean to me this morning, and I am going to move."

There is other evidence to the same effect.

Appellee testified that three or four times, when no third person was present, she asked appellant to have a legal ceremony of marriage performed, and he said that was a mere matter of form, that she was his legal wife and ought to be satisfied. Appellant denied this testimony of appellee, but testified that she asked him to become her husband and he refused, saying that he didn't want to be married to any one. Appellee's mother, Mrs. Thomas, testified that Marks told her that he never wanted to marry, just wanted to live with a woman.

Appellee testified that she did not know the contents of the agreement of April 19, 1902, but she also testified, at first, that she did not know whether the signature to the agreement was, or not, hers, but finally had to admit that it was. Short, a disinterested witness, testified that he read the instrument to her, and that she, not satisfied with this, asked to read it, and did read it for herself, and even then would not sign it till the money was produced. Mrs. Thomas, appellee's mother, testified that the instrument was read to appellee, and Kuetmeyer, the notary, testified that when he asked her if the agreement was her free act and deed, and if she knew its contents, she answered, " I certainly do," and that neither she nor her mother said they had any fear in respect to the matter. Appellee testified that appellant instructed her to take her mother with her to Short's office. If he had intended force or intimidation, it is hardly to be supposed that he would have desired appellee's mother to be a witness to it. Mrs. Thomas did not testify to any compulsion or intimidation; on the contrary, she testified that when she learned that her daughter was not married, she urged appellant to settle with her. Appellee signed the agreement in her maiden name, apparently without suggestion to do so. We are satisfied from the evidence that appellee well knew and understood the contents of the agreement of settlement, and that she signed it voluntarily and without intimidation or compulsion.

We have carefully read all the evidence, and our conclusion is that it is manifestly insufficient to sustain appellee's claim of marriage with appellant.

The decree will be reversed.