## Josephine Pike v. William W. Pike.

### Gen. No. 11,182.

1. JURY TRIAL—*right to, in separate maintenance proceeding.* The right to a jury trial in a proceeding for separate maintenance is fixed by the Chancery and not by the Divorce Act, and such right, therefore, is not absolute but may be granted or denied within the sound discretion of the court.

2.  ESTOPPEL—*when an, to object arises.*  Where counsel upon a trial of a case agrees with opposing counsel and the trial court as to the correctness of a particular method of procedure, the party represented by such counsel cannot, upon appeal, contend that such procedure was erroneous.

3.  COMMON-LAW MARRIAGE—*when presumption is against a.*  Where it appears that the relations between a man and a woman commenced meretriciously, the presumption is, in the absence of proof of actual marriage, that the character of such relations did not change.

Proceeding for separate maintenance.  Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in the Appellate Court at the March term, 1903.  Affirmed. Opinion filed February 25, 1904.

P. H. BISHOP, for appellant.

A. S. TRUDE and JOHN BARTON PAYNE, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

April 12, 1902, appellant filed a bill for separate maintenance against appellee.  The issues were made up, and the cause was heard on the pleadings and evidence produced in open court, and the court found that the parties had not been legally married, and dismissed the bill for want of equity.  When the cause was called for hearing appellant's solicitor moved that the court cause the issue of fact, whether the parties were husband and wife at the time of filing the bill, to be formed and submitted to a jury for trial, which motion the court overruled.  The following appears in the certificate of evidence:  "Both solicitors for the complainant and for the defendant agreed that the law left it in the discretion of the court, whether the issue should be tried by a jury; that a jury was not a matter of right."

Counsel for appellant now contend that the statute in respect to divorce and that in respect to separate maintenance, are *in pari materia* and, therefore, should be construed together, and that, so construing them, appellant was entitled to a jury to try the issue, marriage or not. We do not concur in this view, but it is sufficient to say

that appellant, after agreeing by her solicitor, in open court, as above stated, cannot now be heard to contend to the contrary. Section 40 of the Chancery Act provides that "the court may, in its discretion, direct an issue or issues of fact to be tried by a jury," and we think the parties in the present case correctly agreed that the law left it to the discretion of the court as to whether an issue should be submitted to the jury, and being in the discretion of the court, if the court had submitted the issue to a jury, as requested, the verdict of the jury would not have been binding on the court, but merely advisory, and the presiding judge might have disregarded it, if he did not approve it, and entered a decree in accordance with his judgment. Titcomb v. Vantyle, 84 Ill. 371.

Appellant's counsel, in his argument, correctly says : " In this case the only question in controversy is that relating to the marriage. If there was no marriage the court had no jurisdiction to proceed, and the appellant was not entitled to any relief." Appellant in her bill alleges "that on, to wit, the 15th day of March, 1898, she was married to and became the wife of William W. Pike, * . * * and thereafter continued to live with him as his wife until on or about the first day of August, 1901, on which last mentioned date the said William W. Pike, without good cause and without the fault or consent of complainant, abandoned her," etc. These allegations appellee in his answer specifically denies. Appellant now claims that a contract of marriage was secretly made between her and appellee, no third person being present. The evidence in the case is very voluminous, the abstract of it being about 344 pages, but there is much of it to which it will not be necessary to refer. The single question to be decided is, whether there was a contract of marriage between the parties as claimed by appellant. Appellant testified that she was born in New Orleans, that her maiden name was Gilmette, and that her father died in 1884, when she was about nine years old. She came to Chicago in the last part of the year 1894,

she says "almost 1895," and after coming to Chicago she changed her name to Mrs. Moffitt. She says she simply changed her name to Mrs. Moffitt because she wanted to; that Moffitt was her guardian, but that she had no property, and he was not appointed her guardian by any court or by any relative of hers; that he must have become her guardian when she was between eighteen or nineteen years of age, and that he used to send her coats and things from wherever he was when traveling. When appellant first came to Chicago she stopped at the Briggs House. She says Moffitt told her that he was going to stop there, and that she found him there, and stopped at the Briggs House about four weeks. She then mentions a number of places where she stopped in Chicago after leaving the Briggs House, and before she became acquainted with appellee. She describes the circumstances under which she became acquainted with him, substantially as follows: She was stopping with a Mrs. Alice Morris, a widow, at Thirtieth street and Indiana avenue, in Chicago. February, 1898, she and Mrs. Morris went from the latter's residence in a cab to the Monroe restaurant, where she saw a carriage or two at the door, and found a few persons in the restaurant, up stairs; that the time was about eleven o'clock in the evening; that she met appellee in about five minutes after her arrival, and was introduced to him by a Mr. Beardsley, an insurance agent; that immediately after the introduction she and Mrs. Morris were going out and appellee volunteered to take her home; that William Hale Thompson, Percival Thompson, Mrs. Morris and appellant were present; that appellee got up with the coachman and she and the others mentioned got inside, and the coach was driven south; that, after being driven south some distance, the carriage stopped and appellee got inside, complaining of being very cold, and insisted on sitting next to appellant, and did so, the others occupying the seat opposite them; that appellee was terribly ill; that they stopped at Wing's restaurant and went up stairs there into a small private dining room, before which William Hale Thompson left for home; that there were no

refreshments served there; that, after they talked awhile, appellant said she wanted to go home, and they left and were driven to Thirtieth street and Indiana avenue, and that, when they reached there, appellee became quite ill again, and said, " Oh ! can't I lie down somewhere on some couch ? " that it was then twelve or one o'clock, and Mrs. . Morris asked appellant to let appellee have her little bedroom, which appellant did, and she and Mrs. Morris occupied the latter's room and appellee and Percival Thompson occupied appellant's room that night, and that appellee breakfasted there next morning and remained until one o'clock. Appellant testified that the second time she saw appellee she came home one night and found him in her little bedroom; also that after having become acquainted with appellee he sent her flowers, and that, by his invitation, she took meals with him at different restaurants. Her account of the occasion when she claims there was a marriage contract between her and appellee is, substantially, that about three weeks after she first met appellee he made an engagement with her to meet him at 12:30 o'clock, p. m., at DeJonghe's restaurant in the Masonic Temple, which she did; that they dined there in a little private room and were very loving to each other; that the day was Thursday, and that appellee said to her, " My dear, I think the world and all of you, and I don't want you to take that position and travel. I want you to stay here, because I have something better than that for you," and she said, " Have you ? Well, tell me;" and he said, " Do you care very much for me ? " and she said, " Yes, I really think I am caring too much for you;" and he said, " Well, I want to make you my wife, and I don't care anything about what you were, or anything like that; I want to make you my wife;" and she said, " Do you, dear ? There is nothing would make me happier than to be your wife; " and that they talked it over, etc., and it was agreed that they would meet at DeJonghe's the next Saturday at one o'clock, take lunch there, and then go to Milwaukee and get married. Also, he told her he

was not in a position to marry, and that if he married her, and his father knew it, he would disinherit him, and that they would have to keep their marriage a secret, and she agreed that no one should know it except such persons as they were compelled to tell of it; that, in accordance with the appointment mentioned, she met appellee at De-Jonghe's at one o'clock the next day and had luncheon there, and that while they were taking luncheon and almost through with it, the following occurred : " Mr. Pike told me, ' Now, my dear, what do you think about our going to Milwaukee; are you ready ? ' I said, ' Yes, dear, I am,' and he thought a little bit. He said, ' Dear, instead of our going to Milwaukee, I have been thinking it over, what is best to do. I think it will be a terrible risk for us to go, and I am so afraid my father will get on to me and I will be penniless. What shall I do ? ' I said, ' Do just as you like; if you don't wish to marry me, if you wish to go back, all right, dear, that is all right.' ' No, I don't. I want to make you my wife. I could not leave you, I could not give you up. I tell you what I think would be best to do. You know that if you and I consent with each other to become man and wife it will be just the same as though a dozen ceremonies are performed. I never would leave you unless that a divorce or something.' I told him I never heard of the law, just merely in a vague way, but ' Dear,' I says, ' if you think, if you say so, why then I will believe you.' He says then, ' It is true, if we both consent to become man and wife.' ' How will you do ? ' He says, ' It is in this way : you tell me, ' Billy,' I shall tell you ' Joe, I take you for my wife,' and you will tell me the same, that you take me for your husband.' I took his hand, and he said, ' Joe, will you become my wife ? ' ' Yes,' I said, ' Billy, I will become your wife.' He says, ' Now, dear,' he says, ' Remember that we are man and wife now.' We held each other's hands when we repeated—I repeated the words that he made me repeat. The words were repeated in this way : ' Billy, I do take you for my husband,' and ' I take you for my wife, dear

Joe.'   Billy said that 'I shall make a good and true hus-
band.   I shall try and be good to you,' and 'I shall be good
and true to you, Billy.'   'I know you will.   I know you
will be truer and better than '—he mentioned a name,
but I won't mention it—than somebody is to another
person.   I said, 'Well, I will.   I know I will make a
good wife to you.'   We talked then, 'What shall we
do now?   You know we are man and wife now, what had
we better do?'   I said, 'Well, just as you say, dear.   Shall
we go to Mrs. Gilman's?   I have arranged the rooms from
her,' " etc.   Appellant testified that they remained in De-
Jonghe's restaurant four hours, when they separated and
met again at the same place about 5:30 p. m., had dinner,
and then drove in a cab to a Mrs. Gilman's place, where ap-
pellant had engaged a room, and that, on their way there,
appellee produced a ring and put it on the third finger of
her left hand, next to her little finger.   Appellant subse-
quently testified that she lost this ring, and that appellee
gave her another one, a plain gold ring, which she produced
on the trial.   She testified that they arrived at Mrs. Gil-
man's about 8:15 o'clock, p. m., and that she introduced
appellee to Mrs. Gilman, saying, " Mrs. Gilman, here I am.
I told you that I might be away for a day or two, and I
want to introduce you to my husband, Mr. Pike."   This,
almost immediately after promising appellee, as she testi-
fied, that she would not disclose the marriage unless com-
pelled so to do.   She further testified that they occupied
the same bed that night, appellee remaining there until
about one o'clock, a. m., when he left to go to his father's
house, where he took breakfast the next morning, and
she took breakfast with Mrs. Gilman; that she never had
sexual intercourse with appellee before the alleged mar-
riage.   In regard to the visit to the Monroe restaurant, we
have omitted to mention that appellant testified that it
was said, in appellee's presence at the restaurant, that Mr.
Gale Thompson had given a bachelor dinner that even-
ing, and that there had been a vaudeville show; but appel-
lant did not claim that, before going to the restaurant, she
knew anything as to what was occurring or to occur there.

The evidence of Mr. Thompson and appellee as to what occurred on the trip from the Monroe restaurant differs very materially from appellant's account.

William Hale Thompson, who has been a member of the city council of Chicago and county commissioner of Cook county, indicating that he is well and favorably known in the city, testified that he gave a dinner at the Monroe restaurant, in honor of a younger brother, Gale Thompson, who was then to be soon married; that the dinner was strictly a bachelors' one, given to young men expected to be connected with his brother's bridal party, and that there was no vaudeville entertainment, nor had there been any intention of having such entertainment, and that no ladies were invited; that shortly after twelve o'clock m., women began to come in large numbers, when Gale Thompson, in whose honor the dinner was given, retired, and the dinner was adjourned, and witness started for home between twelve and one o'clock a. m.; that he first saw appellant on the sidewalk with Mrs. Morris, and he understood they had no means of getting home; that they said they lived on the South Side, and they were invited to enter the carriage and be taken home, or part of the way there; that witness did not know how far south they lived; that the carriage was driven south about a mile, when appellee, who had been on top of it with the driver, got inside and sat on the front seat with appellant; that there was some conversation between appellant and appellee, all of which witness, who sat on the seat opposite them, did not hear; that there were manifestations of affection by appellant toward appellee, and that appellant asked appellee to go to her flat at Thirtieth street and Indiana avenue and spend the night; that she asked appellee twice to go with her to that place, and seemed to be very anxious to have him do so. When the carriage stopped at Wing's restaurant witness left the party, but before leaving he says he requested his brother, Percival, to see that appellee got home safely, and gives, as his reason for this, that appellee was not what he, witness, considered competent, and that, in his opinion, appellant, from

Pike v. Pike.

the conversation he had heard, was a dangerous woman. On cross-examination the witness said that he could not say appellee was drunk, or that he was entirely sober, and that he had not observed any indications that he was sick.

Appellee's testimony of what occurred at the Monroe restaurant, and up to the time he got inside the carriage on its way south, does not materially differ from that of William Hale Thompson. His testimony as to what occurred at the time and after he went inside the carriage, is substantially as follows: " She asked me to come out and see her where she was living at Thirtieth and Indiana. My conversation with her commenced right away after I got in the cab; the first thing I said when I got in there was, I told her I was very cold; it was a very cold night in February; she said that if I came out to Thirtieth and Indiana avenue she would warm me up, or something to that effect; she got very affectionate; she kept talking to me in a low voice all the time; we both held each other's hands; there was something said there about my going to Thirtieth and Indiana avenue to stay all night with her; we went to Wing's restaurant at Twenty-second street; there is where the cab stopped, and we were going in there to get something hot to warm us up; then I was going home. In Wing's I remember we drank a quart of champagne; prior to this night I had not drank anything for a year and a half. The complainant, Alice Morris, Percival Thompson and myself participated in drinking this wine; after we sat there a short time we got into the cab and drove to Thirtieth and Indiana avenue, the Norwood flat building, I think. There was no one there that night but the complainant, Mrs. Morris, myself and Percival Thompson. I remained with the complainant that night in that house; occupied a bed in a small room in that apartment with her. I left the bed about eleven o'clock the next morning." Also that he was not ill at any time from the time he left the Monroe restaurant till he arrived at Thirtieth street and Indiana avenue. Appellee denied specifically appellant's testimony in reference to the alleged marriage. We quote his testi-

mony from the abstract : " I did not say anything to her about going to Milwaukee to be married, or about taking rooms at the Tremont House after we were married, so as to be near my place of business; I did not give her $30 the latter part of February at DeJonghe's restaurant. I met her down town on two or three occasions and had lunch with her, and I had been up to call on her. I saw that ring that was shown here last week for the first time; I never gave her a ring in my life; I gave her some jewelry, a watch, several small pins, and little things. I remember the witness (complainant) testifying about a lengthy conversation at DeJonghe's where she states I promised to marry her; nothing of that kind occurred; I have not been at DeJonghe's more than four or five times altogether with the complainant; she knew this Mr. DeJonghe there and she would be down town perhaps, and she would call me up by telephone and ask me to come over there, and perhaps I would run over; I went there and very often Mr. DeJonghe would sit there at the table with us and talk. At that time I never made her any promise of marriage or talked to her about marriage; that was in the basement of the Masonic Temple; I never said to her that it would be a terrible risk for me to marry her; that my father would make me penniless or anything of that kind. I did not say to her, ' I want to make you my wife; I will not leave you; I will not give you up.' I never told her what a common-law marriage was; I did not know what it was myself; I am learning now; I did not consent then to be husband and wife; nothing was said on the occasion referred to about marriage to her in any way on any plan; she did not take my hand as stated here, between the salad and the ice cream, and say to me, ' Will, you are to be my husband; 'you are my husband;' and I did not say to her about the same period or may be a little later on in the lunch, ' Joe, I will take you to be my wife, you are my wife;' nothing of the kind at any time during the lunch or any part of the lunch in its progress; there was nothing of that kind said; no marriage talked of or discussed or promises made, or after that time, or at any time through my acquaintance with her."

Thus the alleged contract of marriage is flatly denied by appellee, and, considering alone the testimony of the parties, it certainly cannot be said that the alleged contract is proved. In McKenna v. McKenna, 180 Ill. 577, 583, the court say: "Plaintiff in error and defendant in error are the only witnesses on the question of the alleged contract. He denies there was anything said about marriage when the act of sexual intercourse took place in her room. The evidence of the one counterbalances the other." The learned chancellor who heard the cause and who considered the evidence with great care, as his opinion contained in appellant's abstract indicates, found that the relationship between the parties was meretricious in its inception, and we think the finding sustained by the evidence. Appellee, as previously stated, testified that he occupied the same bed with appellant the first night he met her, and his testimony is corroborated by that of William Hale Thompson that appellant, a stranger to appellee, assumed to be very demonstrative toward him in the carriage, and twice invited him to go home with her and manifested anxiety that he would comply with her request. Mrs. Morris, with whom appellant stopped, and who seems to have been her friend, must have known whether appellant, on that night, slept with her, as appellant says she did; but Mrs. Morris was not called as a witness, and Percival Thompson, who appellant says slept with appellee, was, as William Hale Thompson testified, just recovering from a severe attack of appendicitis and was unable to leave his bed at the time of the hearing. In Cartwright v. McGown, 121 Ill. 406, it is said : "When the relation between a man and a woman, living together, is illicit in its commencement, it is presumed to so continue until a changed relation is proved. Without proof of subsequent actual marriage, it will not be presumed from continual cohabitation and reputation of a relation between them, which was of illicit origin." In the same case the court say: "It may be said that the holding of Zerelday out to the world as his wife showed a desire to change his connection with her to that of marriage. But

little importance can be attached to this circumstance, when considered in connection with the other facts of the case. A concubine is often held out to the world as a wife to conceal an illicit cohabitation and prevent a criminal prosecution." In the present case the great preponderance of the evidence is that appellee did not hold out to the world that appellant was his wife, but, on the contrary, sedulously avoided so doing, and that his reputation among his relatives and among all his friends and acquaintances was that he was an unmarried man. Indeed, appellant's own testimony is, that he and she agreed to keep secret the alleged marriage, and not to disclose it unless compelled so to do, and their conduct was such, for the greater part, as to exclude the idea that they were married. Lawrence, witness for appellant, who worked for her as a servant maid in a flat at 2330 Dearborn street, from the first week in June till the last of September, 1898, testified that on one occasion she used the names " Mr. and Mrs. Pike," in their presence, and Pike said, " Oh, Christ, don't call us that; call her Mrs. Moffitt and me Mr. Billy, because my people don't know I have a wife;" and that from that time on witness called her Mrs. Moffitt and him Mr. Billy, and that when they addressed each other he called her Joe, and she him Billy. Appellant, for the most part, went under the name of Moffitt. This is shown by her own testimony and that of others. She testified that she moved into a flat in the Pickwick building in the early part of May, 1898, which was a short time after the alleged marriage, and remained there until May, 1899, and that during the time she was there she went by the name of Moffitt. She testified that while at Mrs. Gilman's, and for two weeks at 2001 Michigan avenue, she went by the name of Pike. She also testified that she lived in a flat in the Follansbee apartment building a year, and while there went by the name of Moffitt. It will be recollected that she testified that the alleged marriage took place in the latter part of February, 1898, and that appellee left her July 29, 1901. In May, 1900, she moved to an apartment building at 2803 Indiana avenue, where she remained until May, 1901.

George Monroe, a mail carrier, testified that he delivered letters to appellant addressed Mrs. Josephine Moffitt at 2803 Indiana avenue in the spring of 1901, and that there was a white card on the mail box at that door with the name Moffitt on it.   Olander, assistant janitor of the Follansbee apartment building while appellant lived there, testified that he knew appellant only by the name Mrs. Moffitt, and did not know who Pike was till he met him at the hearing, and that Mrs. Moffitt was the name on the mail box at the door.   Robert Smith, an iceman, testified that he delivered ice at the Follansbee building in the name of Mrs. Moffitt, and had never seen appellee till the hearing.   About forty letters and postal cards from appellee were put in evidence, written subsequently to the time of the alleged marriage, and twenty of the envelopes in which the letters were contained.   The envelopes were all addressed "Mrs. J. A. Moffitt."   In no instance was any letter or postal card addressed to her as wife or signed by appellee as husband. The address of the letter proper, or postal card, as the case was, was "Sweetheart," or "My dear Joe," or "My Dearest Joe," or "Dear Joe," or "My Dearest," or "Dearest," or "Dearest Girl," or "My Baby," or "My Joe," or "My dear little Googie," or "My dear child," or like terms.   He signed the letters and postal cards, "B," or "Billie," or "Bill," or "Baby," or "Will," or "B. B." or "W," or "W. W. Billie."

Eight telegrams from appellee to appellant, all of dates subsequent to the time of the alleged marriage, were also put in evidence.   Six of the telegrams are addressed, "To Mrs. J. Maffitt," one of them, "To Mrs. J. A. Maffitt," and one of them to "Joe Maffitt."   They are signed, respectively, "B. P.," "B," "W," "W. P." and "William."   No letter or other document was produced tending to show that appellee recognized appellant as his wife, but appellant testified that she received a letter from appellee, which she had lost, and testified to the contents of it as follows: "This is to certify that Josie is my own little wife, and whatever happens I will not leave her," which she says

was written about March 14 or 15, 1898, and was signed by
appellee. Appellee denies this, saying: "I have heard
the paper, the one that she said was lost, mentioned here in
the court room, but that is the first I ever heard of it. I
never signed any such document as was referred to by her;
I never saw anything like that. I first heard of such a
document when it was brought out by the other side in
this case."

Gladys Forbes, an acquaintance of appellant, corroborated
appellee's testimony, saying: "She said she called on a
Mr. George Trude; she went to his office to see if he would
take this case; she told him that she had many letters, and
among those letters was some written agreement between
her and Mr. Pike. Mr. Trude asked her if she would bring
those letters down, and this paper especially, and that he
would see what he could do for her, and she said, 'You
know I can't go back to see him because I haven't got that
little paper of agreement.' She said she never had it; she
said she wanted to see what George Trude would advise
her to do with regard to this case and see if he could make
a settlement."

While appellee was intimate with appellant he furnished
her money to purchase furniture, which was used in the
several flats where she lived, and she, without appellee's
knowledge, as he testified, mortgaged the furniture in her
name of Moffitt. Five of these chattel mortgages were
dated, respectively, May 24, September 26 and October 3,
1900, April 4 and November 16, 1901, and were signed, re-
spectively, "Josephine Moffitt," Josephine Moffitt, single,"
"Mrs. Joe Moffitt," "Mrs. Josephine Moffitt," "Joe
Moffitt."

Appellant made an application to Draper & Kramer,
agents, for a lease of 2803 Indiana avenue from May 1, 1900,
to April 30, 1901, in which the family is thus described:
" No. in family, 2. No. of children, 1 child." The applica-
tion is signed, "Applicant, Mrs. J. W. Maffette," under
which is the name, " Josephine Maffette." The lease was
put in evidence, and runs to J. W. Maffette and William

Pike. A lease was also put in evidence, dated May 1, 1899, of number 24 in the Follansbee apartment building, from May 1, 1899, till April 30, 1900, running to John G. Maffatt and Josephine Maffatt, lessees, and is signed, "Mr. John G. Maffatt, per Josephine Maffatt," and Josephine Maffatt. Also, a large number of promissory notes, of dates subsequent to the time of the alleged marriage were put in evidence, some of them signed "Mrs. Josephine Moffitt," some "Mrs. Joe Moffitt," and some "Joe Moffitt."

It is plain from the evidence mentioned and other evidence in the record, that the parties did not hold themselves out to the world as husband and wife, and the mere fact that they acted, when cohabiting, as if they were such, or that, as appellant and some of her witnesses testify, they sometimes referred to each other as husband and wife, which appellee denies, is not sufficient to establish appellant's claim of marriage. As before stated, their relation having commenced meretriciously, the presumption is that it so continued, in the absence of proof of actual marriage.

In McKenna v. McKenna, 180 Ill. 564, the court say: "Proof of cohabitation as husband and wife does not constitute marriage, but it may be evidence of marriage in some cases. *Consensus, non cubitus, facit matrimonium.* It is the consent of the parties, not their concubinage, which constitutes a valid marriage, is the universally accepted maxim." See, also, Cartwright v. McGown, 121 Ill. 400; Maher v. Maher, 183 Ib. 61, 66, and 1 Bishop on Marriage and Divorce, secs. 967 and 968.

Mrs. Ramey, witness for appellant, testified that in 1898 appellant told her that she and appellee were secretly married at St. Joe, Michigan. Appellant subsequently denied that she was married. Gladys Forbes testified that at a time after the connection between the parties had ceased, she was with appellant in her apartment one afternoon, and that appellant looked out, and thought she saw appellee driving by in a carriage, and witness said to her, "Joe, how would you like to see Billy come up and see you now?" and appellant said, "No;" and witness said: "Would you

be glad to see him?" and she said "No, I wouldn't make up with him if I could; I simply want his money." Also, that appellant said to witness that she was not married; that she thought his folks, knowing that he was mixed up with her, would settle so much money rather than have the scandal come out in the papers. It appears from the evidence that a letter signed "Lawyer" was sent to Mr. Eugene S. Pike, appellee's father, postmarked July 27, 1901, stating that appellee was keeping a woman from New Orleans, etc.; that Mr. Pike, Sr., handed the letter to appellee and that appellee gave it to William F. Berman, who showed it to appellant by appellee's request. Berman was employed at appellee's place of business. Berman testified that when he showed the letter to appellant, and after she commenced reading it, she said, "How ridiculous it is; I never had an idea of marrying Mr. Pike;" and witness said to her that Mr. Pike (referring to appellee's father) was likely to come down there, when she said, "If he comes down here, I don't know anything about Billy Pike, and I will tell him so." Henry Mogg, who negotiated with appellant for a loan to her which the chattel mortgage of April 4, 1901, was made to secure, testified that appellant represented herself to him as a single woman, and that he saw her sign the following affidavit, and that she swore to it in his presence :

" STATE OF ILLINOIS, ⎱ ss.
  County of Cook.    ⎰

CHICAGO, April 4, 1901.

I, the undersigned, do solemnly swear that my legal name is Josephine Moffitt, and that    reside at No. 2803 Indiana Avenue street, Chicago, Cook County, Illinois, and that I am a single woman, and the sole and lawful owner of all the goods and chattels mentioned and described in the within chattel mortgage executed by me April 4, 1901, being the same to which this affidavit is attached and made a part, and I do further swear that said goods and chattels, and each of them, are free and clear from all liens, mortgages, judgments, executions or encumbrances of any kind except this one mortgage, given this day to M. Heartwell for the sum of $436.50, and I do so make oath under the pains and

penalties of wilful perjury.   And I, the said Josephine Moffitt, single, have made, and do now make the foregoing representations to said M. Heartwell or his agent, to receive and obtain from him a loan of money, which the said mortgage hereto attached is given to secure.

Josephine Moffitt,   (Seal.)<br>Single.

Subscribed and sworn to before me, this 4th day of April, 1901.

W. T. Hall, J. P."

Mogg also testified that the word " single " following appellant's signature is in her handwriting, so that there can be no doubt that she knew just what she was doing and what she swore to, and cannot reasonably complain, if it be assumed that she swore to the truth.

The weight of the evidence is to the effect that appellee made his home at his father's house, as he had done before becoming acquainted with appellant.   Indeed appellant, in her examination in chief, testified, in substance, that such was the arrangement between them.   She testified that appellee, speaking of Mrs. Gilman and her rooms, said to her, appellant :   " Very well, dear, you go and see, and make whatever arrangements that you can with this lady.   Tell her that I am not up there very often, that I have to go out of town frequently.   You know why; because I would have to live at home half the time; but we would lunch together, and, well, we could dine many times together, but when my parents are at home I should have to live with them; but when they are out of town I will come right to you, and live there every time they are away."   Eugene S. Pike, appellee's father, testified that in the years 1898, 1899 and 1900, his residence was at 2101 Prairie avenue, Chicago, and that during those years he was at home about forty-five weeks of each year, and that his son, appellee, was also at home, and always slept at the house, except when he went shooting out of the city, and that, during those years, it was not suggested to him that appellee was married.   Duncan Campbell testified that he had worked as houseman for Mr. Pike, Sr., from March, 1900, till the time he testified, November 14, 1902, and, while he worked there, appellee

lived at the house. Michael Toomey testified that he had been a watchman in front of 2101 Prairie avenue for twenty years, and that, during the years 1898, 1899, 1900, and up to August, 1901, appellee lived there. Appellee's visits to appellant, at the different rooms which she occupied during these years, were quite consistent with her being his mistress.

While we have carefully considered all the evidence, and such conflicts as there are in it, we do not think it necessary to refer to it further. Our conclusion from the entire evidence is, not only that appellant has failed to prove the alleged contract of marriage, but that the preponderance of the evidence is to the effect that there was no such contract.

We find no substantial error in the record. If any incompetent evidence was admitted, it must be presumed that the chancellor ignored it, and it appears from his opinion that he expressly ignored certain evidence objected to by appellant's counsel.

We think it to be regretted that a marriage, such as is claimed in this case, contracted secretly between the parties, no third person being present, is legally permissible. The state is vitally interested in the question of marriage and the marriage relation, and the policy of the state, as evidenced by chapter 89 of the statutes, in respect to marriage, is, clearly, that marriages shall be in the presence of witnesses—that they shall have a certain degree, at least, of publicity—and while it has been held that the statutory provisions in respect to marriages do not exclude common law marriages, yet, the declared policy of the state being as stated, all claims of secret common law marriages, when contested, should be closely scrutinized, and, as we think, should never be sustained, unless clearly proven by credible and satisfactory evidence.

The decree will be affirmed.

*Affirmed.*